# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ROBERT CRAIG, : | |
|    Plaintiff, : | CIVIL ACTION |
| : | |
| v. : | NO. 08-4165 |
| : | |
| THOMAS JEFFERSON UNIVERSITY, : | |
|    Defendant. : | |
| : | |

## Memorandum

YOHN, J.                                                                                                July 7, 2009

      Plaintiff Robert Craig brings this employment discrimination (failure to hire) suit against his former employer, Thomas Jefferson University ("Jefferson"), pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq*. Defendant moves for partial dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that some of plaintiff's claims are barred as untimely and that plaintiff has failed to state a disparate impact claim. Defendant also moves to strike plaintiff's request for liquidated damages.[1] For the reasons set forth below, the court will grant defendant's motion to partially dismiss, but will deny defendant's motion to strike.

---

[1] Technically, defendant's motion listed plaintiff's request for liquidated damages as one basis, among others, for partial dismissal of plaintiff's complaint. However, based on defendant's briefing of the issue and the text of the proposed order attached to defendant's reply memorandum (Doc. No. 11), the court interprets defendant's argument as a motion to strike plaintiff's demand for liquidated damages.

I.      **Factual and Procedural Background**[2]

Plaintiff has a hearing disability: he is completely deaf in his left ear and has twenty percent hearing in his right ear. He wears a hearing aid and communicates by reading lips. (Am. Compl. ¶ 16.) Beginning in October 1985, plaintiff worked at Jefferson as a research assistant. Several times during his employment, he was laid off due to lack of grant funding; however, after all but the most recent layoff, plaintiff secured new employment (presumably funded by different grants) such that Jefferson continuously employed him from October 1985 until May 2006. (*Id.* ¶¶ 17-18.) From approximately 2004 through May 2006, Dr. Rene Daniel was plaintiff's direct supervisor at Jefferson. (*Id.* ¶ 19.) Plaintiff received good performance reviews throughout his employment, and his last performance review, dated July 2005, rated him as "highly effective." (*Id.* ¶ 20.)

In January 2006,[3] plaintiff learned that he would again be laid off due to grant funding reduction and thereafter sought other employment within and outside Jefferson. (*Id.* ¶¶ 17-18, 26.) Before his layoff in May 2006, plaintiff applied for two research positions with other Jefferson doctors: one position with Dr. Sergey Spitsin and one position with Dr. Phyllis Flomenberg. Plaintiff received neither position. (*Id.* ¶¶ 21-22.) Plaintiff also interviewed for two other positions at Jefferson: on or about June 27, 2006 with Dr. Phyllis Wachsberger and on or about October 5, 2006 with Dr. Francesco Del Galdo. Plaintiff received neither position. (*Id.*

---

[2] The court draws the facts described herein from plaintiff's allegations. As discussed in section II, below, for the purposes of this motion the court accepts as true all well-pleaded allegations in plaintiff's complaint and views all reasonable inferences in the light most favorable to plaintiff.

[3] The complaint states that plaintiff first learned of his upcoming layoff in "January 2008." From the context of plaintiff's allegations, however, the court is confident that this is merely a typographical error.

¶¶ 23-24.)  Plaintiff alleges that Dr. Daniel spoke with each of these other four Jefferson doctors and informed them of plaintiff's disability.  (*Id.* ¶ 25.)  On or about April 13, 2007, plaintiff applied for a position at Temple University ("Temple").  Also around that date, Dr. Daniel spoke with Dr. Satya Kunapuli of Temple about plaintiff.  Plaintiff alleges that, based on this discussion, plaintiff did not receive the Temple position.  Plaintiff further alleges that the Temple interviewer "implied [plaintiff] was not selected due to his disability."  (*Id.* ¶¶ 27-28.)  Plaintiff states that it was only then that he became aware (and was first able to become aware) "of the discriminatory practices he was subjected to at [Jefferson] in 2006 at the hand's of [d]efendant's employees and/or agents . . . when he was not selected for positions he had applied for with [d]efendant."  (*Id.* ¶ 29.)  Specifically, plaintiff alleges that Jefferson "set a course to fail to hire" him and that Dr. Daniel, acting with discriminatory animus, "intentionally sabotaged [plaintiff's] chances of obtaining employment with Temple University."  (*Id.* ¶¶ 31-32.)

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Pennsylvania Human Relations Commission ("PHRC") on May 15, 2007.  (Def.'s Partial Mot. Dismiss Ex. 1; Pl.'s Resp. Ex. B.)  Thus, at least 380 days elapsed between the time plaintiff applied for positions with Drs. Spitsin and Flomenberg and the time plaintiff filed his administrative charge.  Approximately 322 days elapsed between the time plaintiff interviewed with Dr. Wachsberger and the filing of plaintiff's administrative charge.  Approximately 222 days elapsed between the time plaintiff interviewed with Dr. Del Galdo and the filing of plaintiff's administrative charge.  Approximately 32 days elapsed between the time plaintiff interviewed for the Temple position and the filing of plaintiff's administrative charge.  As summarized above, plaintiff alleges the dates on which he *applied* or *interviewed* for the listed positions.  Neither the complaint nor any other document on record

with the court alleges or discloses the dates on which plaintiff learned that he would not be hired for any of these positions. As discussed below, however, in his response to defendant's motion, plaintiff twice concedes that it was before July 19, 2006 that he learned he did not receive the positions with Drs. Spitsin, Flomenberg, or Wachsberger and it was before November 16, 2006 that he learned he did not receive the position with Dr. Del Galdo. (Pl.'s Mem. Law Resp. Def.'s Partial Mot. Dismiss ("Pl.'s Mem.") 6, 8.)

On or about May 28, 2008, the EEOC mailed a right to sue letter to plaintiff. (Am. Compl. ¶ 13.) Plaintiff commenced this action on August 27, 2008, alleging ADA and PHRA violations and seeking damages, injunctive relief, and attorney's fees and costs. (*Id.* Requested Relief ¶¶ b-f.) Plaintiff lists liquidated damages as one of the many types of damages sought. (*Id.* Requested Relief ¶ d.)

## II.     Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.[4] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). When evaluating a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiff's complaint and must view any reasonable inferences that may be drawn therefrom in the light most favorable to the plaintiff. *See Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).

The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). This statement must "'give the defendant

---

[4] In addition to the allegations contained in the complaint, "courts generally consider . . . exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and alterations omitted). Furthermore, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations and footnote omitted); *see also Phillips*, 515 F.3d at 232.

In *Ashcroft v. Iqbal*, the Supreme Court discussed "[t]wo working principles" underlying *Twombly*. 129 S. Ct. 1937, 1949 (2009). "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950 (citing *Twombly*, 550 U.S. at 556).

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

**III.    Discussion**

### A. Timeliness

#### 1. The ADA

"A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds if it is apparent on the face of the Complaint that the action was untimely filed and the affirmative defense was also clearly plead by defendants." *Large v. County of Montgomery*, 307 F. App'x 606, 608 (3d Cir. 2009) (per curiam, not precedential) (citing *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994)). The ADA incorporates the powers, remedies, and procedures from Title VII of the Civil Rights Act of 1964, codified in 42 U.S.C. §§ 2000e-4, e-5, e-6, e-8, and e-9. 42 U.S.C. § 12117(a). As such, when addressing plaintiff's ADA claims, the court looks to those statutory provisions and case law interpreting them. Section 2000e-5(e)(1) provides:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier . . . .

42 U.S.C. § 2000e-5(e)(1). Defendant concedes that, under this provision, plaintiff had 300 days following each alleged act of discrimination to file charges with the EEOC.[5,6] (Def.'s Mem. Law

---

[5] Plaintiff does not dispute defendant's assertion that timeliness within the statutory 300-day window must be determined separately as to each alleged act of discrimination. Indeed, plaintiff acknowledges that, should the court disagree with his arguments based on the discovery rule and *Ledbetter*, some of his claims would be untimely while others would be timely. (Pl.'s Mem. 6, 8.)

[6] Neither party addresses the issue of whether, under § 2000e-5(e)(1) and the timeliness requirements of the PHRA (discussed in section III.A.2., below), a plaintiff who institutes a state

Supp. Def.'s Partial Mot. Dismiss ("Def.'s Mem.") 5.)  Importantly, "the time limitations set forth in Title VII [and applicable to the ADA] are not jurisdictional.  These time limitations are analogous to a statute of limitations and are, therefore, subject to equitable modifications, such as tolling."  *Oshiver*, 38 F.3d at 1387 (internal citation omitted).

Defendant argues that Count I, raising claims under the ADA, is untimely as to two of the alleged acts of discrimination: defendant's failure to hire plaintiff for the positions with Drs. Spitsin and Flomenberg.  In response, plaintiff argues his ADA claims are timely under *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007) or the discovery rule.  Alternatively, plaintiff argues that Count I is timely as to his claims regarding the October 2006 failure to hire (for the position with Dr. Del Galdo) and Dr. Daniel's involvement with plaintiff's application to Temple.  Defendant—seeking only partial dismissal of Count I—does not dispute the timeliness of those claims or plaintiff's failure to hire claim for the position with Dr. Wachsberger.  The court will, therefore, address the timeliness of only those claims for which timeliness is in dispute.[7]

---

filing *more than* 180 days after the alleged unlawful employment practice occurred nevertheless has 300 days to file a charge with the EEOC.  As that issue is not before the court, it does not affect the court's present decision.

[7] As the 300-day window from § 2000e-5(e)(1) is not jurisdictional, defendant bears the burden of proving untimeliness.  *See Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997) ("In Title VII actions, failure to exhaust administrative remedies is an affirmative defense in the nature of statute of limitations.  Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving that the plaintiff has failed to exhaust administrative remedies.  Accordingly, the burden of pleading and proving that [plaintiff] has not exhausted her administrative remedies *in a timely way* rested on the [defendant]." (emphasis added; internal citations omitted)).  Although the above quotation from *Williams* focuses more on exhaustion than timeliness, those issues are closely tied in the context of employment discrimination because the 300-day window is a time limitation on exhaustion.  Moreover, the quotation makes clear that the burden of the affirmative defense of untimeliness falls on defendant.

Preliminarily, the court notes that, as explained in Section I, above, plaintiff applied for the positions with Drs. Spitsin and Flomenberg at least 380 days before he filed his charge with the EEOC. The record does not reveal the precise date on which plaintiff learned he had not received either of these positions. However, in response to defendant's motion, plaintiff twice concedes that he learned he would not be hired for these positions more than 300 days before he filed his charge with the EEOC. Specifically, plaintiff twice acknowledges "should the Court find the statute of limitations began with the act of denial of employment, the [p]laintiff's claims under the EEOC regarding the failure to hire in October 2006 and regarding Dr. Daniel's discriminatory intent as to the reference provided to Temple University in April 2007 would still be timely." (Pl.'s Mem. 6, 8.) The negative implication of this concession—inescapable, though not explicitly stated—is that defendant denied employment to plaintiff with respect to the positions with Drs. Spitsin, Flomenberg, and Wachsberger more than 300 days before plaintiff filed a charge with the EEOC. Thus, the ADA claims related to Drs. Spitsin and Flomenberg—the ADA claims that defendant asserts are untimely—would be untimely unless they are, in some other way, rendered timely. Therefore, the court will next address plaintiff's arguments as to why those claims are timely.

                I.       **_Ledbetter_**

Plaintiff argues that, under *Ledbetter*, all of his ADA claims are timely. (Pl.'s Mem. 5-6.) *Ledbetter*—which dealt with the timeliness of pay discrimination claims and was later legislatively overruled by the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2 (codified, in part, as 42 U.S.C. § 2000e-5(e)(3))—simply does not support plaintiff's position that all of his ADA claims are timely. Specifically, at page 5 of his responsive memorandum, plaintiff quotes a footnote from *Ledbetter* and argues that the footnote's reasoning renders his claims timely. That

footnote states:

> Of course, there may be instances where the elements forming a cause of action span more than 180 days [or 300 days in a case such as plaintiff's where a relevant state or local agency exists]. Say, for instance, an employer forms an illegal discriminatory intent towards an employee but does not act on it until 181 days later. The charging period would not begin to run until the employment practice was executed on day 181 because until that point the employee had no cause of action. The act and intent had not yet been joined. Here, by contrast, Ledbetter's [pay discrimination] cause of action was fully formed and present at the time that the discriminatory employment actions were taken against her, at which point she could have, and should have, sued.

*Ledbetter*, 550 U.S. at 631 n.3.

Plaintiff argues that, under the reasoning of this footnote, all of his ADA claims are timely because "[t]here was no way for [p]laintiff to know of the discriminatory animus of [d]efendant's employees and/or agents which resulted in the denial of employment until April 2007." (Pl.'s Mem. 5.) The court struggles to follow plaintiff's logic, which sounds more in the principles underlying the discovery rule (discussed below) than the reasoning of the *Ledbetter* footnote. Contrary to plaintiff's arguments, his situation is not analogous to that described in the *Ledbetter* footnote. Defendant's intent and action, as to each alleged act of discrimination, had joined when defendant engaged in each respective act of failing to hire plaintiff. The date on which plaintiff first actually suspected discriminatory animus is irrelevant in this context. Plaintiff seems to confuse the issue of the employer's intent with that of the employee's knowledge. Thus, *Ledbetter* does not render timely plaintiff's ADA claims as to the positions with Drs. Spitsin and Flomenberg.

### ii. The Discovery Rule

Alternatively, plaintiff argues that the discovery rule applies to his case and renders all of his ADA claims timely. The Supreme Court has noted that it has declined to address whether a

discovery rule affects the timeliness of claims to which Title VII's limitations period applies, as it does for plaintiff's ADA claims. *Ledbetter*, 550 U.S. at 642 n.10. The Third Circuit, however, has explained how the discovery rule applies in an employment discrimination (failure to hire) case. *Oshiver*, 38 F.3d at 1385-87, 1390-91 (discussing the discovery rule in the context of a gender-based failure to hire claim brought under the time restrictions of § 2000e-5(e)). "In short, the discovery rule functions to delay the initial running of the statutory limitations period, but only until the plaintiff has discovered or, by exercising reasonable diligence, should have discovered (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *Id.* at 1386.

> As the Third Circuit explained:
>
> There will, of course, be times when the aggrieved person learns of the alleged unlawful employment practice, for example, at the very moment the unlawful employment practice occurs; in such cases the statutory period begins to run upon the occurrence of the alleged unlawful employment practice. However, there will also be occasions when an aggrieved person does not discover the occurrence of the alleged unlawful employment practice until some time after it occurred. The discovery rule functions in this latter scenario to postpone the beginning of the statutory limitations period from the date when the alleged unlawful employment practice occurred, to the date when the plaintiff actually discovered he or she had been injured. In either scenario, once the plaintiff's cause of action has accrued, that is, once the plaintiff has discovered the injury, the statutory limitations period begins to run and the plaintiff is afforded the full limitations period, starting from the point of claim accrual, in which to file his or her claim of discrimination.

*Id.* at 1385-86 (internal citation omitted). More generally, "[a] claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence of and source of an injury." *Id.* at 1386. "Thus, the 'polestar' of the discovery rule is not the plaintiff's actual knowledge of injury, but rather whether the knowledge was known, or through the exercise of reasonable diligence, knowable to the plaintiff." *Id.*; *see also Podobnik v. United States Postal Serv.*, 409 F.3d 584, 590-91 (3d Cir. 2005) (quoting *Oshiver* and following

*Oshiver*'s application of the discovery rule in the context of an age discrimination case). Critically, it is "awareness of *actual* injury, not . . . awareness that this injury constitutes a *legal* wrong" that defines when a claim accrues under the discovery rule. *Id.* (emphasis added); *see also Hanani v. New Jersey Dep't of Envtl. Prot.*, 205 F. App'x 71, 76 (3d Cir. 2006) (quoting and following *Oshiver*).

The distinction between actual and legal injury is crucial to the discovery rule, as described in *Oshiver*. The Third Circuit explained that "the limitations period in Title VII cases starts to run on the date when the plaintiff knows or reasonably should know that the discriminatory act has occurred, *not* on the date the victim first perceived that a discriminatory motive caused the act." *Oshiver*, 38 F.3d at 1386-87 (emphasis in original) (citing *Merrill v. Southern Methodist University*, 806 F.2d 600, 604-05 (5th Cir. 1986)). Under the facts of *Oshiver*, which included a wrongful discharge claim, the Third Circuit concluded that "for purposes of the discovery rule, [plaintiff] 'discovered' the injury on April 10, 1990, the very date defendant law firm informed her of her discharge." *Id.* at 1391. "That [plaintiff] may not have known on April 10, 1990, that her discharge constituted an actionable legal wrong does not matter for discovery rule purposes," the Third Circuit went on to explain, because "the discovery rule hinges upon actual, as opposed to legal, injury." *Id.* at 1391 n.9; *see also Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) ( stating that the statute of limitations in a wrongful discharge case did not begin to run until plaintiff discovered "that a decision to terminate him had been made.").[8]

---

[8] The court is not blind to the precarious position occupied by potential discrimination plaintiffs in light of the above-described discovery rule. This version of the rule, hinging on discovery of actual rather than legal injury, has its "origins . . . in products liability and medical malpractice cases," and "the rule finds perhaps its most natural application in cases where legal

Applying the discovery rule to the facts, as alleged, of plaintiff's case reveals that the discovery rule does not render plaintiff's claims as to Drs. Spitsin and Flomenberg timely. As discussed above, plaintiff concedes that defendant denied him employment as to those two positions more than 300 days before plaintiff filed a charge with the EEOC. (Pl.'s Mem. 6, 8.) Thus, as to those two claims, plaintiff's actual injury—the denial of employment—occurred outside of the limitations period.

Citing *Oshiver*, plaintiff argues that the discovery rule renders these claims timely because he did not learn (and could not have learned) of defendant's discriminatory intent or motivation until April 2007 when his Temple interviewer "implied that [plaintiff] was not selected for the position due to his disability, and that [the interviewer's] discussion with Dr. Daniel regarding [plaintiff] and his disability influenced this decision." (Pl.'s Mem. 7.) Put another way, plaintiff argues that, while he knew defendant had denied him employment (*i.e.*, that he suffered *actual* injury) more than 300 days before the EEOC charge, he did not know and

---

injury flows from physical injury." *Oshiver*, 38 F.3d at 1385 n.5.
  Discovery of the archetypical sponge left inside a patient (the actual injury) is strongly suggestive of legal injury (*e.g.*, medical malpractice). In the malpractice context, a reasonable person who discovers an actual injury can be readily expected to exercise diligence in determining the legal implications of that injury. In contrast, the situation is murkier in the context of employment discrimination. While there are few, if any, non-negligent explanations for the unintentional, post-operative presence of a surgical instrument inside a patient, there are a host of legitimate, nondiscriminatory reasons why a particular applicant may be denied employment (*e.g.*, inadequate qualifications, competition with better-qualified applicants, personality clashes, etc.). That is, the "flow" from actual injury to legal injury may be less apparent to a potential employment discrimination plaintiff than to a potential malpractice or products liability plaintiff. It is even possible that, in the employment context, direct adoption of the malpractice-style discovery rule outside of its "natural" environment will, perversely, prompt premature, non-meritorious lawsuits as plaintiffs are forced to weigh the cost of bringing suit following a negative employment action for which they do not yet have cause to suspect discrimination against the risk of being time-barred if and when they later discover evidence of discrimination. Nevertheless, the court must apply to this case the existing law of the discovery rule.

could not have known that discriminatory animus motivated those denials (*i.e.*, that he suffered *legal* injury) until April 2007.[9]  Thus, plaintiff asks the court to apply a discovery rule under which his causes of action would accrue on the date he became aware of his *legal* injury rather than the dates he became aware of his *actual* injuries.  Such a rule would contravene Third Circuit precedent.  Under the discovery rule, as it presently applies to employment discrimination actions brought in the Third Circuit, plaintiff's causes of actions accrued upon his awareness of the denials of employment (the actual injuries) by the acts of another (Jefferson), not his awareness of alleged discriminatory motivation.  As such, the discovery rule does not render plaintiff's claims as to Drs. Spitsin and Flomenberg timely.  Plaintiff has failed to establish a means by which these untimely claims could be considered timely,[10] and the court will, therefore, dismiss Count I as to plaintiff's claims that defendant denied him employment for positions with

---

[9] Plaintiff makes no allegation that he exercised reasonable diligence in attempting to learn why defendant failed to hire him.  Instead, he relies on the assertion that he could not have learned of defendant's allegedly discriminatory animus until April 2007.

[10] In support of its motion, defendant also argues that the doctrine of equitable tolling does not render plaintiff's disputed claims timely.  Plaintiff does not argue that his case justifies equitable tolling of the § 2000e-5 limitations period, so the court need not address the doctrine.  Nevertheless, the court notes that the doctrine does not aid plaintiff.  In contrast to the discovery rule, which determines the date on which a cause of action accrues, "[e]quitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed." *Oshiver*, 38 F.3d at 1387.  The Third Circuit has described "three principal, though not exclusive, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Id.* (citing *Sch. Dist. of City of Allentown v. Marshall*, 657 F.2d 16, 19-20 (3d Cir.1981)).  Here, the alleged facts implicate none of these situations, nor does plaintiff otherwise allege facts to justify the extraordinary application of equitable tolling.  "[W]here the plaintiff's failure to file timely cannot be attributed to any inequitable conduct on the part of the defendant, an automatic extension of the statute of limitations by the length of the tolling period does not make sense as a matter of equity." *Id.* at 1390.

Drs. Spitsin and Flomenberg.

### 2. The PHRA

Like its federal analogues, the PHRA also features a limitations period within which a plaintiff must file an administrative complaint. "To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997) (citing 43 Pa. Cons. Stat. § 959(a), establishing procedures for complaints filed with the PHRC, and 43 Pa. Cons. Stat. § 962, setting forth right to and procedures for court action *after* having properly sought relief from the PHRC); *see also* 43 Pa. Cons. Stat. § 959(h) (setting forth the 180-day limitations period for seeking administrative relief).

> If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA. The Pennsylvania courts have strictly interpreted this requirement, and have repeatedly held that "persons with claims that are cognizable under the Human Relations Act must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act."

*Woodson*, 109 F.3d at 925 (quoting *Vincent v. Fuller Co.*, 616 A.2d 969, 974 (Pa. 1992)).

As discussed in Sections I and III.A.1, above, the record does not reveal the precise dates on which plaintiff learned he had not received any of the positions for which he had applied at Jefferson. Nevertheless, in response to defendant's motion, plaintiff twice concedes that he learned he would not be hired for these positions more than 180 days before he cross-filed with the PHRC. Specifically, plaintiff twice acknowledges that "should the Court find the statute of limitations began with the act of denial of employment . . . the claims regarding Dr. Daniel's discriminatory actions in April 2007 were filed with both the EEOC and PHRC within 180 days of their occurrence. Accordingly, [p]laintiff's claims under the PHRA should not be dismissed

14

[as untimely]." (Pl.'s Mem. 6, 8.) As the court found with respect to plaintiff's similar concession regarding his ADA claims, plaintiff concedes—inescapably, though implicitly—that defendant denied employment to him with respect to the positions with Drs. Spitsin, Flomenberg, Wachsberger, and Del Galdo more than 180 days before plaintiff cross-filed with the PHRC. As such, these four claims are untimely under the PHRA. For the reasons discussed in section III.A.1, above, plaintiff has not established any method by which these otherwise untimely claims could be rendered timely. Accordingly, the court will dismiss Count II as to these four untimely claims.

Plaintiff also brings a claim in Count II as to Dr. Daniel's alleged sabotaging of plaintiff's application for the Temple position. (Am. Compl. ¶¶ 28, 32, 44; Pl.'s Mem. 6, 8.) Though it is, perhaps, doubtful that plaintiff will be able to maintain an action against Jefferson for an employment decision by Temple that was allegedly influenced by an agent of Jefferson, defendant does not challenge Count II as to this claim. Therefore, the court will not dismiss Count II in its entirety.

    **B.**     **Disparate Impact**

As part of Count I, plaintiff alleges:

> Defendant knew or should have known that its employment practices had a disparate impact upon [p]laintiff and failed to stop, continued, and/or encouraged its practice thus aiding and abetting the discriminatory practices by its agents, servants, contractors, workmen, supervisors, managers and employees in violation of law.

(Am. Compl. ¶ 39.) As the Supreme Court has stated, "disparate-impact claims are cognizable under the ADA." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). The Court quoted the Sixth Circuit, stating: "'In a disparate impact situation . . . the issue is whether a neutral selection device . . . screens out disproportionate numbers of [the protected class].'" *Id.* at 54 (quoting

*Grano v. Dep't of Dev.of City of Columbus*, 637 F.2d 1073, 1081 (6th Cir. 1980)) (brackets in *Raytheon*).

Defendant argues that plaintiff fails to sufficiently allege a disparate impact claim because he fails to identify a facially neutral employment policy of Jefferson's that had a disparate impact on him as a member of a protected class. (Def.'s Mem. 11.) In response, plaintiff relies on the standards of notice pleading codified in Federal Rule of Civil Procedure 8 (discussed in Section II, above). Plaintiff admits that he "cannot point to a specific policy of [d]efendant's to support [his] claim." (Pl.'s Mem. 8.) Rather, "[p]laintiff believes . . . that such a policy exists and will be uncovered through discovery." (*Id.*)

As plaintiff's response shows, the complaint does not "raise a [disparate impact claim] above the speculative level." *Twombly*, 550 U.S. at 555. Instead, plaintiff's reference to disparate impact is merely a "label[] and conclusion[]" that does not "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* (quoting *Conley*, 355 U.S. at 47). Plaintiff did not support his legal conclusion of disparate impact with factual allegations. *See Ashcroft*, 129 S. Ct. at 1949-50. There is absolutely no reference to a specific allegedly facially neutral employment policy that had a disparate impact. Thus, the complaint does not "permit the court to infer more than the mere possibility of misconduct." *Id.* at 1950. Accordingly, plaintiff has failed to sufficiently allege discrimination under a disparate impact theory in violation of the ADA, and the court will dismiss Count I to the extent it raises a disparate impact claim.[11]

**C.    Liquidated Damages**

---

[11] Count II makes no mention of disparate impact.

Finally, defendant argues that plaintiff's demand for liquidated damages is improper under both the ADA and PHRA (Def.'s Mem. 11-12), and defendant asks the court to strike that demand (Def.'s Reply 4). In his opposition to defendant's motion, plaintiff failed to address the propriety of his liquidated damages demand. Defendant is correct in asserting that liquidated damages are not available under the ADA. *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 36 (5th Cir. 1996) ("Liquidated damages are not recoverable under the ADA."); *see* 42 U.S.C. § 12117(a) (incorporating Title VII's powers, remedies, and procedures codified in 42 U.S.C. §§ 2000e-4, e-5, e-6, e-8, and e-9, which do not include liquidated damages).

However, defendant has failed to establish that liquidated damages are unavailable under the PHRA. In support of its position regarding the PHRA, defendant cites only 43 Pa. Cons. Stat. § 962, subsection (c)(3) of which provides:

> If the court finds that the respondent has engaged in or is engaging in an unlawful discriminatory practice charged in the complaint, the court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirmative action which may include, but is not limited to, reinstatement or hiring of employes [sic], granting of back pay, *or any other legal or equitable relief as the court deems appropriate*. Back pay liability shall not accrue from a date more than three years prior to the filing of a complaint charging violations of this act.

(emphasis added). Thus, not only does the PHRA fail to explicitly prohibit liquidated damages, the text of the statute broadly authorizes "any other legal or equitable relief" deemed appropriate.

This is not to say, however, that the PHRA authorizes any and all forms of relief without limitation. The Pennsylvania Supreme Court has held, for example, that punitive damages are not available under the PHRA. *Hoy v. Angelone*, 720 A.2d 745, 751 (Pa. 1998); *see Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 570 n.3 (3d Cir. 2002) (citing *Hoy*). However, the court is not aware of (and defendant does not cite to) any case law establishing that liquidated damages

17

are excluded from the "any other legal or equitable relief" expressly authorized in the PHRA.[12] Nor is the court aware of any case holding that liquidated damages *are* available under the PHRA.

It is, perhaps, unlikely that the Pennsylvania legislature intended liquidated damages to be available under the PHRA. Still, given the PHRA's expansive remedial language, the lack of case law addressing the issue, and the dearth of briefing submitted by the parties on the issue—little by defendant-movant and none by plaintiff—the court will not, at this juncture, strike plaintiff's demand for liquidated damages as to his PHRA claim (Count II). Defendant may, of course, raise the issue again at a later stage of the proceedings, at which time the court would expect more robust briefing.

## IV. Conclusion

Defendant challenges the timeliness of Count I as to Jefferson's denials of employment to plaintiff for the positions with Drs. Spitsin and Flomenberg and the timeliness of Count II as to Jefferson's denials of employment to plaintiff for the positions with Drs. Spitsin, Flomenberg, Wachsberger, and Del Galdo. Because defendant correctly asserts that those claims are untimely under the respective statutes, the court will dismiss Count I, in part, and Count II, in part, as to each of the challenged claims. Furthermore, because plaintiff has failed to allege discrimination

---

[12] The posture of many cases *implies* that liquidated damages are unavailable under the PHRA. *See, e.g.*, *Argue v. David Davis Enters., Inc.*, No. 02-9521, 2008 WL 450097 at *2-*4 (E.D. Pa. Feb. 15, 2008) (in a case in which plaintiff brought claims under both the Age Discrimination in Employment Act ("ADEA") and the PHRA, discussing whether punitive and liquidated damages were available under the ADEA but only discussing whether punitive damages were available under the PHRA); *Zippittelli v. J.C. Penny Co., Inc.*, No. 05-2214, 2007 WL 674588 at *13 (M.D. Pa. Feb. 28, 2007) (in a case in which plaintiff brought, *inter alia*, claims under both the ADEA and the PHRA, finding liquidated damages were not available to plaintiff, but only explaining why liquidated damages were unavailable under the ADEA, without reference to the PHRA). Nevertheless, the court is not aware of any case holding so.

under a disparate impact theory in violation of the ADA, the court will dismiss Count I, in part, to the extent it raises a disparate impact claim.  Finally, although liquidated damages are not available under the ADA, defendant has failed to establish that liquidated damages are not available under the PHRA; therefore, the court will deny defendant's motion to strike plaintiff's request for liquidated damages at this juncture.